IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-298-FL

MICHAEL ANTONY ATKINSON,          )
                                  )
          Plaintiff/Claimant,     )
                                  )
                                  )     **MEMORANDUM AND**
          v.                      )     **RECOMMENDATION**
                                  )
MICHAEL J. ASTRUE, Commissioner of )
Social Security,                  )
                                  )
          Defendant.              )

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-41, DE-46] pursuant to Fed. R. Civ. P. 12(c). Claimant Michael Antony Atkinson ("Claimant") filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the denial of his application for a period of disability and Disability Insurance Benefits ("DIB"). Claimant responded [DE-48] to Defendant's motion and the time for filing a reply has expired. Accordingly, the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, this court recommends granting Claimant's Motion for Judgment on the Pleadings, denying Defendant's Motion for Judgment on the Pleadings and remanding the case pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further proceedings consistent with the Memorandum and Recommendation. This court recommends denying Claimant's motion to remand this case pursuant to sentence six of 42 U.S.C. § 405(g).

## STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on 11 April 2007, alleging disability beginning 25 October 2006. (R. 12). His claim was denied initially and upon reconsideration. *Id.* A hearing before the Administrative Law Judge ("ALJ") was held on 12 August 2009, at which Claimant was represented by counsel and a vocational expert ("VE") appeared and testified. (R. 26-57). On 8 September 2009, the ALJ issued a decision denying Claimant's request for benefits. (R. 9-25). On 9 June 2010, the Appeals Council denied Claimant's request for review. (R. 1-6). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171,

2

176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id*. At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id*.

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id*. § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id*. § 404.1520a(e)(2).

3

In this case, Claimant alleges the following errors by the ALJ: (1) failure to classify Claimant's reflex sympathetic dystrophy syndrome ("RSDS") as a severe impairment; (2) finding that the severity of Claimant's mental deficiency does not meet or equal the requirements of Listings 12.04 and 12.06; and (3) improper assessment of Claimant's credibility. Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") at 1, 9, 13, 15. Claimant argues further that there is new and material evidence that should be incorporated into the record and considered by the ALJ on remand pursuant to sentence six of 42 U.S.C. § 405(g). *Id.* at 17.

## FACTUAL HISTORY

### I. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R.14). Next, the ALJ determined Claimant had the following severe impairments: left medial gonarthrosis with degenerative meniscus pathology s/p (partial) knee replacement, right knee with mild degenerative changes, right hip bursitis, facet arthritis in lumbar spine, depression and anxiety. *Id.* The ALJ classified Claimant's impairments of lipoma-right breast and non-insulin diabetes mellitus as non-severe. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* In reviewing Claimant's alleged mental impairment and applying the technique prescribed by the regulations, the ALJ found Claimant had mild restrictions in activities of daily living and social functioning, moderate difficulties with regard to concentration, persistence or pace and no episodes of decompensation. (R. 15).

4

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform sedentary work,[1] frequently balance, stoop and crouch, occasionally kneel, crawl and climb stairs and ramps, and the capacity to understand, remember and carry out simple, routine tasks. (R. 16). In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 19). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work. (R. 20). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 21).

## II.    Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 48 years old and unemployed. (R. 32). Claimant was last employed as a machine operator, a position held for twenty-seven years. (R. 32). Claimant has not worked since October 2006 as a result of a work injury to his left knee, for which he underwent partial knee replacement. (R. 34, 38, 43).

Claimant testified to experiencing chronic pain, rated as an 8 on a scale of 1 to 10, in his left knee, right hip, both ankles and lower back. (R. 35, 37, 41). Claimant attributed his right hip pain

---

[1] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a); Soc. Sec. Ruling ("S.S.R.") 96-9p, 1996 SSR LEXIS 6, at *8, 1996 WL 374185, at *3. "Occasionally" generally totals no more than about 2 hours of an 8-hour workday. "Sitting" generally totals about 6 hours of an 8-hour workday. S.S.R. 96-9p, 1996 SSR LEXIS 6, at *8-9, 1996 WL 374185, at *3. A full range of sedentary work includes all or substantially all of the approximately 200 unskilled sedentary occupations administratively noticed in 20 C.F.R. § 404, Subpt. P, App. 2, Table 1. *Id.*

to his altered gait which developed following his knee injury. (R. 35). Claimant experiences lower back pain when he walks. (R. 38). Claimant complained also of numbness and tingling in both feet and in his right arm. (R. 38-39). Claimant relies on a cane when walking. (R. 35). Following knee surgery, Claimant was diagnosed with major depressive disorder and anxiety disorder with suicidal thoughts. (R. 36, 39). Claimant stated he continues to have suicidal thoughts as well as auditory hallucinations. (R. 39). Claimant takes "about six" medications a day for pain and depression. (R. 41). Claimant testified that he must be reminded to take his medications and when he fails to do so, his pain, thoughts of suicide and temper worsen. (R. 42). As a result of medication side effects, including drowsiness, dizziness and lightheadedness, Claimant takes "at least two [or] three" naps each day and testified that there are "some days" where he does not feel like getting out of bed. (R. 37, 42).

As for daily activities, Claimant testified to taking at least two to three naps daily due to limited sleep during the night. (R. 41-42). Claimant is able to drive and leaves his home on occasion to visit relatives. (R. 42, 49). Claimant performs no household chores and does not shop for groceries. (R. 42). Claimant spends the majority of his day laying down on the couch and listening to the radio. (R. 49).

### III.   Vocational Expert's Testimony at the Administrative Hearing

Andrea Newlight, Ph.D., testified as a VE at the administrative hearing. (R. 50-56). After the VE's testimony regarding Claimant's past work experience (R. 50-51), the ALJ posed the following hypothetical assuming an individual the same age as Claimant and possessing the same educational background:

Assume [the] individual has the capacity [to perform light work] . . . unlimited

6

capacity for pushing and pulling up to the capacity [for light work] . . . the capacity to frequently balance, stoop, and crouch . . . [and] to occasionally climb stairs and ramps [and] kneel and crawl . . . no limitations in reaching, handling and fingering . . . capacity to understand, remember and carry out simple, routine tasks . . . interact with co-workers, supervisors, and the general public . . . identify and avoid common work place hazards and . . . adapt to routine changes in the work place. Can [the hypothetical individual] perform any of [Claimant's] past work . . . .

(R. 53). The VE responded in the negative but explained that such an individual could perform the following unskilled, light work positions which exist in significant numbers regionally and nationally: (1) office cleaner (DOT #323.687-014); (2) photocopy machine operator (DOT #207.685-014); (3) parking lot attendant (DOT #915.473-010); and (4) cashier II (DOT #211.462-010). (R. 53-55). The ALJ then asked the VE whether jobs would be available if the hypothetical individual was limited to sedentary work. The VE responded the hypothetical individual could perform the following positions which exist in significant numbers regionally and nationally: (1) food checker (DOT #211.482-014) and (2) surveillance system monitor (DOT #379.367-010). The VE testified further that the parking lot attendant position could also satisfy the second hypothetical. (R. 54). Finally, the ALJ asked whether any of the above jobs would be precluded if either hypothetical individual used "a single point cane for longer periods of walking." (R. 55). The VE testified such a limitation would only preclude the position of office cleaner. *Id.* The VE testified substantial gainful activity would be precluded if an individual required "additional breaks more than customarily allowed" or would be absent for up to twenty percent of the work week. (R. 56).

## DISCUSSION

### I.   Review of additional evidence submitted to the Appeals Council

The Appeals Council incorporated the following additional evidence into the record: (1) physical therapy records from NovaCare Rehabilitation dated 13 September 2006 to 13 March 2008

7

(R. 540-46, 557-78, 580-601, 604, 606-24, 633-35, 637-56, 658-72);[2] (2) a Physical Work Performance Evaluation by Cheryl Canupp, PT, DPT, of NovaCare Rehabilitation, dated 18 July 2007 (R. 547-56)[3]; (3) treatment records by Chris Edwards, Ph.D., of Duke University Medical Center, dated 27 July 2009, 24 August 2009, 17 September 2009, 12 October 2009, 20 January 2010 (R. 510-19, 812-19)[4]; (4) a Department of Veterans Affairs ("the VA") Rating Decision dated 17 November 2009 (R. 674-78); (5) a letter by Susan A. Hay, M.D., of the Department of Veteran Affairs Medical Center ("VA Medical Center"), dated 27 April 2010, and a medication list from Dr. Hay dated 26 April 2010 (R. 674-78, 831-33). Although the Appeals Council discounted the additional evidence (R. 1-2), the court must review this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y, Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (explaining where the Appeals Council incorporates additional evidence into the

---

[2] Records for twenty-three physical therapy sessions occurring between 13 September 2006 and 15 November 2006 appear at R. 580-601, 664-65. Duplicate copies of these treatment records appear at R. 778-79, 787-808. Records for fifty-nine physical therapy sessions occurring between 20 December 2006 and 17 May 2007 appear at R. 557-78, 637-56, 659-663. Duplicate copies of these treatment records appear at R. 712-17, 735-71, 773-77. Records for twelve physical therapy sessions occurring between 19 July 2007 and 23 August 2007 appear at R. 540-46, 633-35, 658, 666-72. Duplicate copies of these records appear at R. 708-10, 718-24, 772, 780-86. Records for sixteen physical therapy sessions occurring between 9 January 2008 and 13 March 2008 appear at R. 604, 606-24. Duplicate copies of these records appear at 679-99.

The additional physical therapy records also include (1) a Patient Statement Inquiry – a chart outlining the basic services (e.g., "Initial Eval-Physi," "Therapeutic Exercise," "Electrical Stim Unat," "Hot/Cold Pack") provided during the physical therapy sessions occurring between 13 September 2006 and 13 March 2008 (R. 520-38); (2) recommendations and prescriptions (dated 2006 and 2007) for physical therapy by Lewis P. Martin, M.D. (R. 625-27, 631-632, 700-02, 706-07); and (3) "[t]reatment [p]rescriptions" from NovaCare Rehabilitation (R. 628-30, 636, 703-05, 711).

[3] A duplicate copy of the July 2007 evaluation by Ms. Canupp appears at R. 725-34.

[4] Duplicate copies of Dr. Edwards' treatment records appear at R. 820-30.

8

administrative record, the reviewing court must "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [ALJ's] findings"). However, at this stage, Claimant bears the burden of demonstrating that the additional evidence is (1) new, i.e., not duplicative or cumulative of that which is already in the record, (2) material, i.e., would have changed the outcome of the ALJ's decision; and (3) relates to the claimant's medical condition as it existed at the time of the hearing. 20 C.F.R. § 404.970(b); *see Wilkins*, 953 F.2d at 96 (citations omitted); *see also Eason v. Astrue*, No. 2:07-CV-30-FL, 2008 U.S. Dist. LEXIS 66820, at *8, 2008 WL 4108084, at *3 (E.D.N.C. Aug. 29, 2008) (citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). In this case, the relevant time period extends from 25 October 2006 (Claimant's alleged disability onset date) to 8 September 2009 (the date of the ALJ's decision).

A.     Physical therapy records

Upon review of these records, the court finds this evidence material as these records arguably would have affected the ALJ's credibility determination. In evaluating Claimant's credibility, the ALJ specifically noted that Claimant's "not attending physical therapy [is] not consistent with his allegations of debilitating symptoms." However, the physical therapy records consist of a total of one hundred ten (110) physical therapy sessions occurring between September 2006 and March 2008. As a treating source opined, Claimant "has [] done adequate physical therapy . . . ." (R. 496).

B.     Physical Work Performance Evaluation

The evaluation performed by Ms. Canupp is duplicative, as this very same document appeared in the record submitted to the ALJ. (R. 17-18, 368-77). Accordingly, this evidence is immaterial.

9

## C.    Treatment records by Dr. Edwards

Treatment records by Dr. Edwards dated July 2009 through September 2009[5] chronicle Claimant's complaints of sleep disturbance, fatigue, depressed mood, poor concentration and suicidal ideations and include a diagnosis of posttraumatic stress disorder ("PTSD"). (R. 510-11, 514, 517). The July 2009 record indicates a Global Assessment of Functioning ("GAF") score of 44.[6] (R. 519). These records also indicate a diagnosis of major depressive disorder. (R. 511, 514, 518). Dr. Edwards' records from October 2009 and January 2010 indicate an improvement in Claimant's depression, no suicidal ideations and a GAF score of 47. (R. 812-814, 816-17).

The records from July through September 2009 are arguably cumulative of those considered by the ALJ, and in particular, the medical records of treating physicians Jenny Smith, M.D., with Wilson Psychiatric Associates, and K.M. Verma, M.D.,[7] which denote similar complaints by Claimant, a diagnosis of major depressive disorder and GAF scores of 35 and 40.[8] (R. 427, 438). However, in evaluating Claimant's credibility regarding his symptoms associated with his mental

---

[5] The September progress note is dated 17 September 2009 and thus post-dates the ALJ's 8 September 2009 decision. However, the Commissioner does not contest that this evidence arguably relates back to the ALJ's decision. Def.'s Mem. Supp. Def.'s Mot. J. Pleadings ("Def.'s Mem.") at 12.

[6] The GAF scale ranges from zero to one-hundred and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), 32 (4th ed. 1994). A GAF score between 41 and 50 indicates "[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32 (bold typeface omitted).

[7] Dr. Smith saw Claimant on seven occasions between August 2007 and March 2008. (R. 430-38). Dr. Verma saw Claimant on seven occasions between May 2008 and July 2008. (R. 419-428).

[8] A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV at 32 (bold typeface omitted).

10

impairment, the ALJ found that Claimant "appears to have exaggerated his symptoms through psychological evaluations because there was very limited evidence that the claimant sought consistent treatment for his mental impairments." (R. 19) (emphasis added). The objective evidence indicates however that Claimant underwent treatment for his mental impairments beginning in August 2007 with Dr. Smith, continued to do so through 2008 with Dr. Verma and then sought treatment in 2009 with Dr. Edwards. Because the ALJ discounted Claimant's credibility in part on the lack of consistent treatment for his mental impairment and the record reveals otherwise, Dr. Edwards' progress notes from July through September 2009 impact the ALJ's credibility decision and thus are material. However, the court finds Dr. Edwards' treatment records dated 12 October 2009 and 20 January 2010 immaterial as the court is unable to discern whether in reaching his findings expressed in the records, Dr. Edwards relied on evidence in existence during the relevant time period thereby reflecting Claimant's condition at that time. *See Wilkins*, 953 F.2d at 96; *Eason*, 2008 U.S. Dist. LEXIS 66820, at \*8, 2008 WL 4108084, at \*3.

D.    Department of Veterans Affairs Rating Decision

On 17 November 2009, approximately two months subsequent to the ALJ's decision, the VA granted Claimant a 30% service connected disability rating for PTSD. (R. 675-66). In granting this rating, the VA attributed Claimant's PTSD to having witnessed certain events during a humanitarian mission near Cuba while a member of the United States Coast Guard in the early 1980s. (R. 675). In finding Claimant's PTSD was service-connected, the medical evidence on which the VA relied consisted of a psychiatric examination conducted by Kathy D. Mayo, M.D., dated 4 October 2009, approximately one month after the ALJ's decision. *Id.* Dr. Mayo's report was not included as part of the additional evidence reviewed by the Appeals Council; thus, the court is unable to discern

11

whether in her diagnosis Dr. Mayo relied on evidence in existence during the relevant time period thereby reflecting Claimant's condition at that time. *See Eason*, 2008 U.S. Dist. LEXIS 66820, at *9, 2008 WL 4108084, at *4 (finding claimant failed to carry burden where record was unclear whether "the additional supporting materials submitted after the ALJ's decision [were] applicable during the alleged disability period").

E.    Records from Dr. Hay

In her letter dated 27 April 2010, Dr. Hay, Claimant's treating psychiatrist at the VA Medical Center, states Claimant is undergoing treatment for PTSD and major depressive disorder, recurrent, severe with psychotic features and explains

> it is apparent that he is totally disabled from his depression and anxiety. He also has severe Reflex Sympathetic Dystrophy of left lower limb. It is my opinion that this combination of mental health and medical problems make it extremely unlikely that he will be able to be gainfully employed in the future.

(R. 831). Dr. Hay states that she has had only two appointments with Claimant; however, her opinion is not accompanied by any medical evidence – with the exception of a list of medications prescribed to Claimant – supporting her opinion that Claimant is incapable of working. As such, this court is unable to discern whether Dr. Hay relied on evidence in existence during the relevant time period reflecting Claimant's condition at that time. Accordingly, this additional evidence cannot change the outcome in this case, and thus is not material. *Id.*

## II.    The ALJ's failure to classify Claimant's RSDS as a severe impairment is reversible error.

Claimant contends the ALJ erred in the second step of the sequential evaluation process by failing to classify Claimant's RSDS as a medically determinable impairment and argues that this failure is reversible error. Pl.'s Mem. at 14.

12

At step two of the sequential evaluation process, the claimant bears the burden of demonstrating a severe, medically determinable impairment that has lasted or is expected to last for a continuous period of at least twelve months. 20 C.F.R. §§ 404.1509 and 1520(a)(4)(ii); *Bowen v. Yuckert*, 482 U.S. 137, 140, 146 n.5 (1987). The Act and regulations describe "a physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); 20 C.F.R. § 404.1508. The regulations further require that physical or mental impairments must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. § 404.1508.

The Social Security Administration ("SSA"), in recognizing that the pathogenesis of RSDS (also known as Complex Regional Pain Syndrome-Type I ("CRPS")) is not entirely understood, has issued S.S.R. 03-2p to explain the Commissioner's policies for developing and evaluating disability claims based on RSDS. The ruling recognizes RSDS as a chronic neurological pain disorder characterized by "a constellation of symptoms and signs" that may occur following an injury to bone or soft tissue. *See* S.S.R. 03-2p, 2003 SSR LEXIS 2, at *4, 2003 WL 22399117, at *1 (2003). Those suffering from RSDS "typically report persistent, burning, aching or searing pain that is initially localized to the site of the injury. The involved area usually has increased sensitivity to touch. The degree of reported pain is often out of proportion to the severity of the precipitating injury." S.S.R. 03-2p, 2003 SSR LEXIS 2, at *6, 2003 WL 22399117, at *2. Finding RSDS as a medically determinable impairment requires the presence of chronic pain and clinically documented medical signs, symptoms, and laboratory findings. *Id.*, 2003 SSR LEXIS 2, at *11, *17, 2003 WL 22399117,

13

at *6. Signs and laboratory findings include swelling, autonomic instability, abnormal hair or nail growth, osteoporosis, or involuntary movements of the affected region of the initial injury. *Id.*, 2003 SSR LEXIS 2, at *12, 2003 WL 22399117, at *2.

Here, the ALJ failed to use the framework set forth in S.S.R. 03-2p for identifying RSDS as a medically determinable impairment and in fact, did not reference this ruling in her decision. Instead, in evaluating Claimant's RSDS, the ALJ found that "due to the conflicting opinions of more than one treating physician the undersigned has determined that this impairment is not a medically determinable impairment. The claimant's subjective reports of pain are considered in the assessed [RFC]." (R. 15) (footnote omitted). In support of this finding, the ALJ acknowledged Claimant's one-time consultation with Erhan Atasoy, M.D., of the Rex Pain Management Center on 8 October 2009 and Claimant's diagnosis of RSDS by Claimant's pain specialist, David C. Hogarty, D.O., of Wayne Rheumatology & Musculoskeletal Medicine. (R. 15 n.1, 449-50, 455-57). As for Dr. Atasoy's treatment record, the ALJ noted that upon conducting a full clinical examination, Dr. Atasoy found no "overwhelming evidence for complex regional pain syndrome." (R. 15, 457). The ALJ observed, however, that during a January 2009 visit, Dr. Hogarty indicated Claimant was "[m]arginally better with increased Cymbalta" but in April 2009, Dr. Hogarty "noted he would write a letter in support of [] [C]laimant's Social Security disability claim noting [RSDS] in the lower limb." (R. 15, 449-50). Claimant contends the ALJ has distorted the record "as no other treating physician ever disagreed with Dr. Hogarty[]." Pl.'s Mem. at 14.

The record shows that Claimant injured his left knee in August 2006 in a work-related incident. (R. 16, 283). Since then, Claimant has complained of pain and increased sensitivity to touch around his left knee. The first mention of RSDS appears in a treatment record dated 26

14

September 2006 wherein Lew Martin, M.D., Claimant's treating orthopaedist, observes that Claimant's sensitivity to touch around his left knee "may indicate" RSDS. (R. 281). The next mention of RSDS appears in a treatment record dated 3 July 2007, wherein Dr. Martin opines that it may be reasonable for Claimant to visit a pain specialist "and be considered for a diagnosis of RSD, since he has such severe response to touching his skin and hypesthetic response." (R. 271). Later that same month, Dr. Martin reiterated his concern that Claimant's "hypesthetic situations may represent" RSDS, explained a "workup for [RSDS] . . . would require a second opinion with a pain specialist," and noted that Claimant was not interested in visiting a specialist at that time. (R. 270).

Approximately one year later, on 8 August 2008, Claimant visited Dr. Hogarty for a pain management consult, who, in diagnosing Claimant with RSDS/CRPS I, observed that Claimant had swelling in his knee and discoloration of skin over his anterior knee. (R. 460, 462). In a follow-up visit on 9 September 2008, Dr. Hogarty observed allodynia (i.e., increased sensitivity to touch) and mild swelling, again indicated RSDS as the diagnosis and recommended that Claimant undergo pain management. (R. 458). As acknowledged by the ALJ, Claimant visited Dr. Atasoy for an independent medical examination regarding "the possible diagnosis of [RSDS]." (R. 455). While observing "significant allodynia and hyperesthesia," Dr. Atasoy did not make any clinical findings such as swelling or skin discoloration. (R. 456). Dr. Atasoy did not find "overwhelming evidence for" RSDS. (R. 456). As also acknowledged by the ALJ, Claimant visited Dr. Hogarty again in January and April 2009, who on both occasions diagnosed Claimant with RSDS. (R. 450).

In light of the above, the court finds that the ALJ's premise for rejecting RSDS as an impairment – that is, conflicting opinions by treating sources – is not substantial evidence. In reviewing Dr. Hogarty's records, it is evident that his diagnosis of RSDS was based on signs

15

indicative of this impairment. Furthermore, the fact that Dr. Atasoy – who saw Claimant only on one occasion – found no signs supporting a diagnosis of RSDS is not surprising. As S.S.R. 03-2p explains,

> [w]hen longitudinal treatment records document persistent limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since the date of the precipitating injury, disability adjudicators can reliably determine that RSDS[] is present and constitutes a medically determinable impairment. *It may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of RSDS[], and do not affect a finding that a medically determinable impairment is present.*

*Id.*, 2003 SSR LEXIS 2, at *12, 2003 WL 22399117, at *4 (emphasis added); *see also Brooks v. Barnhart*, 428 F. Supp. 2d 1189, 1191-92 (N.D. Ala. 2006) (given the transient nature of RSDS, "the medical opinion of treating physicians, particularly those with a longitudinal perspective, are accorded great deference and weight").

Given the low burden that Claimant must meet at step two, the court concludes that the ALJ's failure to consider Claimant's diagnosis of RSDS as a medically determinable impairment is not supported by substantial evidence. However, the ALJ's failure to find Claimant's RSDS a severe impairment is not necessarily reversible error. *See Jones v. Astrue*, No. 5:07-CV-452-FL, 2009 U.S. Dist. LEXIS 13893, at *6, 2009 WL 455414, at *2 (E.D.N.C. Feb. 23, 2009) (finding no reversible error where an ALJ does not consider whether an impairment is severe at step two of the sequential evaluation provided the ALJ considers that impairment in subsequent steps). Here, the Commissioner contends no reversible error exists because the ALJ considered Claimant's allegations of pain "from [] RSD[S] (or other source[s])" in determining Claimant's RFC. Def.'s Mem. Supp. Def.'s Mot. J. Pleadings ("Def.'s Mem.") at 7. Indeed, following her determination that Claimant's

16

RSDS is not a medically determinable impairment, the ALJ stated that "[C]laimant's subjective reports of pain are considered in the assessed [RFC]." (R. 15). Claimant argues to the contrary, contending the ALJ "ignore[d] [the] effects [of RSDS] when calculating Claimant's [RFC]." Pl.'s Mem. at 15.

Review of the ALJ's opinion indicates that the ALJ discussed evidence related to Claimant's RSDS, including Claimant's subjective complaints of pain as well as objective medical evidence, when assessing Claimant's RFC. However, as discussed in detail below, the court finds the ALJ's failure to acknowledge that it "is characteristic of RSDS that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual" and "conflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the complicated diagnostic process involved," adversely impacts the ALJ's credibility analysis. S.S.R. 03-2p, 2003 SSR LEXIS 2, at *5, 14, 2003 WL 22399117, at *1, 5; *see Hill v. Comm'r of Soc. Sec.*, No. 6:10-cv-46-Orl-GJK, 2011 U.S. Dist. LEXIS 15382, at *31, 2011 WL 679940, at *11 (M.D. Fla. Feb. 16, 2011) (noting "the ALJ failed to specifically evaluate [c]laimant's RSD, in accordance [with] SSR 03-2p, at any step in sequential evaluation process" and finding this failure "necessarily undermines" the ALJ's credibility determination).

Accordingly, the court finds that the ALJ's failure to classify Claimant's RSDS as a severe impairment at step two of the sequential evaluation analysis was reversible error.

**III.    The ALJ's finding that Claimant's impairments did not meet or equal Listings 12.04 and 12.05 is not supported by substantial evidence.**

Claimant argues that the ALJ erred by finding that his impairments do not meet or equal Listing 12.04, the listing for affective disorders, and Listing 12.06, the listing for anxiety related

17

disorders. Pl.'s Mem. at 11.

To establish the required severity of Listing 12.04 or Listing 12.06, Claimant must show that he meets the criteria listed in both sections "A" and "B," or the requirements of section "C." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06. The ALJ did not discuss the section "A" criteria of either listing; however, the Commissioner contends "the ALJ conceded part A in both these [listings] as the evidence shows [Claimant] had both depression and anxiety . . . ." Def.'s Mem. at 8. The ALJ found, however, that Claimant did not meet the section "B" or "C" criteria for either listing. (R. 15). Claimant does not dispute the ALJ's determination as to section "C" but argues he has satisfied the section "B" criteria which is identical under both listings. In particular, section "B" under both listings requires that the section "A" disorder (identified by Claimant as "depressive syndrome" and "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress") result in at least two of the following:

1.     Marked restriction of activities of daily living;
2.     Marked difficulties in maintaining social functioning;
3.     Marked difficulties in maintaining concentration, persistence, or pace; or
4.     Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06.

Here, the ALJ found Claimant had mild restrictions in activities of daily living and social functioning, moderate difficulties with regard to concentration, persistence or pace and no episodes of decompensation. (R. 15). The ALJ cited no evidence for this finding within his step three discussion. Rather, the ALJ's analysis regarding Claimant's mental impairments is found within the ALJ's RFC discussion. *See Jones*, 2009 U.S. Dist. LEXIS 13893, at *7-8, 2009 WL 455414, at *3 (explaining although "[s]uch collapsing of the analysis of the evidence by an ALJ is not the preferred

18

form of opinion writing for an ALJ because it makes review of his opinions more difficult, [] it is not necessarily reversible error") (citation omitted).

In assessing Claimant's mental RFC, the ALJ relied on the following: (1) a May 2007 evaluation conducted by state agency consultant Gary Bachara, Ph.D. (R. 318); (2) a May 2008 evaluation by K.M. Verma, M.D. (R. 427); (3) treatment records from Dr. Smith (R. 430-38); and (4) an April 2009 psychological evaluation conducted by Dr. Chartier (R. 490-92). (R. 18-19). In summarizing these records, the ALJ noted that Dr. Bachara found Claimant capable of understanding, retaining and following instructions, performing simple and routine tasks, tolerating stress and getting along with others and assigned Claimant a GAF score of 60.[9] (R. 18, 318). While acknowledging that Dr. Verma found Claimant had poor concentration and suffered from paranoid feelings and assigned Claimant a GAF score of 35, the ALJ found Dr. Verma's assessment unsupported by the record and based solely on Claimant's subjective complaints. (R. 18, 318, 427). The ALJ did not summarize records from Dr. Smith, noting only that Claimant saw her "for his problems with depression and [] was prescribed Cymbalta to deal with his symptoms." (R. 18). Finally, in discussing Dr. Chartier's evaluation findings, the ALJ noted Dr. Chartier's conclusion that "the possibility of the claimant developing psychotic depression/hallucinations as a result of a slip and fall was very unusual and clinically highly improbable and the claimant may have answered the questions the way that he did because of possible secondary gain." (R. 19, 492). Based on this evidence, the ALJ concluded Claimant

is capable of understanding, remembering and carrying out simple, routine, repetitive tasks. He also appears to have exaggerated his symptoms through psychological

---

[9] A GAF score of 60 indicates "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV at 32 (bold typeface omitted).

evaluations because there was very limited evidence that the claimant sought consistent treatment for his mental impairments. The record also does not indicate that there were any cognitive or memory difficulties or problems getting along with others and handling stress associated with his depression and anxiety.

(R. 19).

Claimant contends he suffers from (1) marked difficulties in maintaining concentration, persistence and pace and (2) marked difficulties in maintaining social functioning. Pl.'s Mem. at 13. In support of this argument, Claimant relies on his reports to Drs. Smith, Verma and Edwards of avoiding family and friends, fatigue, difficulty sleeping, irritability, feelings of hopelessness and worthlessness, thoughts of suicide and visual and auditory hallucinations. (R. 338-40, 419-26, 432, 434-36, 514, 517). Claimant also relies on progress notes from Dr. Edwards who observed "severe," "marked" or "extreme" symptoms associated with Claimant's mental impairment, including insomnia, feelings of worthlessness, fatigue, concentration difficulties, avoidance of activities, places or people, were observed "severe," "marked" or "extreme." (R. 511, 515). Finally, Claimant cites his low GAF scores as further evidence of his marked limitations in both concentration and social functioning. (R. 427, 438, 519).

In response to the above, Defendant relies on Dr. Chartier's examination which suggested Claimant exaggerated his limitations, the lack of definitions or explanations for the severity ratings used by Dr. Edwards "such that [the ratings] can be related to" the "B" criteria, and Dr. Edwards' finding that Claimant was capable of employment albeit in the most limited of positions" (R. 514). *Id.* at 11-12. Defendant also argues that GAF scores are not determinative of disability and are of little value given they "are not based on any testings, but are 'current period' ratings given by the physician based on his or her belief regarding the patients [sic] need for ongoing therapy." Def.'s

20

Mem. at 9.

As explained in more detail below, Dr. Chartier's statement was made without the benefit of Dr. Edwards' treatment records, found to be material evidence by this court, which indicate Claimant's flashbacks are symptoms of his PTSD and undermine Dr. Chartier's statement that Claimant was exaggerating his symptoms. Defendant's invitation to discount Dr. Edwards' findings on the basis that his progress notes fail to define the severity ratings discussed therein is essentially a request for this court to weigh such evidence. The court's duty, however, is to determine if substantial evidence supports the ALJ's conclusion. *See Mastro*, 270 F.3d at 176. As a treating physician, Dr. Edwards' opinion indicates Claimant has some difficulty in maintaining concentration and social functioning and thus potentially impacts the ALJ's decision. *See Craig v*, 76 F.3d at 590 (explaining the opinion of a treating physician is generally entitled to "great weight"). Next, Dr. Edwards' statement that Claimant's "current capacities are consistent with only the most limited of positions" does not necessarily preclude a step-three finding in Claimant's favor. The listings define "marked" as

> mean[ing] more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.

20 CFR 404 Subpart P, App. 1 § 12.00(C). When viewed in combination with other evidence, including Claimant's GAF scores, it is unclear that in making the statement about Claimant's limited employability, Dr. Edwards was suggesting Claimant could perform such work on a sustained basis. As for GAF scores, "[t]he Social Security Administration has taken the stance that the GAF scale 'does not have a direct correlation to the severity requirements in [the social security] mental

21

disorders listings.'" *Crockett v. Astrue*, No. 2:10-CV-64, 2011 U.S. Dist. LEXIS 60308, at *36, 2011 WL 2148815, at *11 (W.D. Va. 2011) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000)). Nevertheless, "[a] claimant's GAF score must be considered along with all the other relevant evidence of record." *Id.* Here, Claimant's GAF scores (40 on 2 August 2007; 35 on 1 May 2008 and 44 on 27 July 2009) were observed to be consistently low by Drs. Smith, Verma and Edwards, suggesting serious impairment in social and occupational functioning. (R. 427, 438, 519); *see Kirkland v. Astrue*, 645 F. Supp. 2d 528, 531 (E.D.N.C. 2009) (noting claimant had submitted substantial evidence of moderate to severe depression and citing GAF scores of 50 and 59). When considered with other evidence of record, including Claimant's consistent reports of various symptoms associated with depression to Drs. Smith, Verma and Edwards, the court disagrees with Defendant that Claimant's GAF scores are of little value.

In addition to relying on medical evidence in support of his argument, Claimant alleges numerous errors on the part of the ALJ in her analysis regarding Claimant's mental impairments. First, Claimant notes that he has been prescribed numerous medications – not just Cymbalta – "all of which he was compliant in taking, and never received adequate relief from his symptoms." Pl.'s Mem. at 10. In particular, Claimant notes that since April 2007, he has taken a variety of medications for his mental impairment, including Celexa (R. 296, 470), Ambien (R. 435), Lyrica (R. 432), Remeron (R. 430), Haldol (R. 428), Wellburtin and Klonopin (R. 420). According to a medical list dated 17 June 2009, Claimant was still taking Celebrex, Cymbalta, Haldol and Ambien. (R. 496). The court agrees that it is unclear from the ALJ's decision as to whether she properly acknowledged the numerous medications Claimant was prescribed for depression.

Second, Claimant contends the ALJ erroneously relied on a lack of consistent treatment for Claimant's mental impairments. In particular, Claimant notes that in 2007, Wallace R. Nelms, M.D., Claimant's primary care physician, began treating Claimant for depression which was "not being handled that well" with the prescribed medication. (R. 469). On 2 August 2007, Dr. Nelms noted that Claimant "[c]omes in wanting to see a psychiatrist." (R. 470). That same day, Claimant saw Dr. Smith who treated Claimant for depression on seven occasions between August 2007 and March 2008. (R. 430-38). Thereafter, Claimant sought treatment with Dr. Verma on seven occasions between May 2008 and July 2008.[10] (R. 419-428). Additional evidence submitted to the Appeals Council, which has been found by this court to be material, indicates Claimant continued to seek treatment in 2009 with Dr. Edwards. (R. 510-19). The court agrees that the medical evidence indicates Claimant sought treatment for his mental impairment on a fairly consistent basis.

Third, Claimant contends the ALJ improperly relied on the examinations performed by Drs. Bachara and Chartier in May 2007 and April 2009, respectively. Pl.'s Mem. at 10; (R.316-18). At the time of Dr. Bachara's consultative examination performed 17 May 2007, Claimant notes that his "depression was in its early stages and he was only receiving medication from his primary physician [Dr. Nelms]." *Id.* at 10-11. With respect to Dr. Chartier's 23 April 2009 evaluation, Claimant faults the ALJ for relying on Dr. Chartier's statement that "the possibility of the claimant developing psychotic depression/hallucinations as a result of a slip and fall was very unusual and clinically highly improbable," arguing this statement "was made without knowledge of [Claimant's three prior surgeries to his leg and the extensive psychological treatment which he had undergone for both

---

[10] Claimant contends he saw "Dr. Verma consistently from May of 2008 into the first part of 2009;" however, the court is unable to locate records from Dr. Verma beyond 25 July 2008. Pl.'s Mem. at 10; (R. 419-428).

depression and PTSD." *Id.* at 11; (R. 19, 492). In discussing Claimant's "hallucinations" wherein Claimant described seeing deaths associated with the Cuban refugee crisis, Dr. Chartier stated "[i]t was unclear whether this experience is actually a hallucination or a vivid visual memory." (R. 490). Dr. Chartier's report also suggested that Claimant was exaggerating his depression symptoms. (R. 492). The court agrees that Dr. Chartier's statement and findings were made without the benefit of Dr. Edwards' treatment records which indicate Claimant's flashbacks are symptoms of his PTSD.[11]

In light of the ALJ's failure to explain how she arrived at her section "B" findings, Dr. Edwards' records indicating Claimant was suffering from PTSD during the relevant time period and the errors outlined above, the court cannot conclude the ALJ's step three finding is supported by substantial evidence.

**IV.    The ALJ improperly assessed Claimant's credibility.**

Claimant contends the ALJ failed to properly assess Claimant's credibility. Pl.'s Mem. at 10. This court agrees.

Federal regulation 20 C.F.R. § 404.1529(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology. *See Craig*, 76 F.3d at 593. Under this regulation, "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Id.* at 594. First, as an objective matter, the ALJ must determine whether Claimant has a medical impairment which could reasonably be expected to produce the pain or other

---

[11] Defendant notes Claimant's report to an SSA representative in May 2007 that his daily activities included watching television, cooking, performing personal care and running errands. Def.'s Mem. at 12; (R. 19, 169). While acknowledging Claimant's testimony that his daily activities decreased substantially by 2009, Defendant notes Dr. Chartier's report that suggested Claimant was exaggerating his limitations. However, as explained above, Dr. Chartier did not have the benefit of Dr. Edwards' records.

symptoms alleged. *Id.*; *see also* S.S.R. 96-7p, 1996 SSR LEXIS 4, at *5, 1996 WL 374186, at *2. If this threshold question is satisfied, then the ALJ evaluates the actual intensity and persistence of the pain or other symptoms, and the extent to which each affects a claimant's ability to work. *Id.* at 595. The step two inquiry considers "all available evidence," including objective medical evidence (i.e., medical signs and laboratory findings), medical history, a claimant's daily activities, the location, duration, frequency and intensity of symptoms, precipitating and aggravating factors, type, dosage, effectiveness and adverse side effects of any pain medication, treatment, other than medication, for relief of pain or other symptoms and functional restrictions. *Id.*; *see also* 20 C.F.R. § 404.1529(c)(3); S.S.R. 96-7p, 1996 SSR LEXIS 4, at *6, 1996 WL 374186, at *3. The ALJ may not discredit a claimant solely because his or her subjective complaints are not substantiated by objective medical evidence. *See id.* at 595-96. However, neither is the ALJ obligated to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." S.S.R. 96-7p, 1996 SSR LEXIS 4, at *6, 1996 WL 374186, at *3.

Here, the ALJ considered Claimant's subjective complaints, including knee pain and symptoms associated with depression. (R. 17-19). The ALJ found that Claimant had medically determinable impairments reasonably capable of causing Claimant's subjective symptoms but concluded Claimant's subjective complaints were not fully credible. (R. 19). In reaching this conclusion, the ALJ reasoned as follows: (1) Claimant's report to an SSA representative in May 2007 that his daily activities included watching television, cooking, performing personal care and running errands (R.169); (2) Claimant's "poor compliance with recommended therapies such as his initial hesitation to seek the assistance of a pain management clinic and not attending physical therapy;"

25

and (3) Claimant's exaggeration of his symptoms "through psychological evaluations and self-limiting behavior" (R. 368, 492). (R. 19).

As noted above, any reliance on the May 2007 report as to Claimant's daily activities is misplaced. Medical records from Dr. Edwards support Claimant's testimony that his activities of daily living became less involved over the relevant time period. With respect to Claimant's physical therapy attendance, as observed earlier, Claimant attended over one hundred physical therapy sessions occurring between September 2006 and March 2008. (R. 540-46, 557-78, 580-601, 604, 606-24, 633-35, 637-56, 658-72). Dr. Edwards' diagnosis of PTSD suggests Claimant's psychotic symptoms and hallucinations were not exaggerated and that the ALJ's reliance on Dr. Chartier's psychological evaluation was misplaced. Furthermore, the ALJ's reliance on the "self-limiting behavior" exhibited by Claimant in a physical work performance evaluation is called into question given the ALJ's failure to properly account for Claimant's RSDS and the fact that it is characteristic that the degree of reported pain associated with RSDS is often out of proportion to the severity of the precipitating injury. *See* S.S.R. 03-2p, 2003 SSR LEXIS 2, at *6, 2003 WL 22399117, at *2.

While it is not the province of this court to weigh the evidence considered by the ALJ, the court must consider whether the ALJ considered and analyzed all the relevant evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. The ALJ may not select and discuss only that evidence that favors her ultimate conclusion. *See Loza v. Apfel*, 219 F.3d 378 (5th Cir. 2000) (explaining the ALJ "cannot 'pick and choose' only the evidence that supports his position"); *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("In addition to discussing the evidence supporting his decision in a social security disability benefits case, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."). Here, evidence exists that

26

suggests Claimant's description of his pain and depression symptoms is supported by objective evidence. Accordingly, the court cannot find that the ALJ's credibility finding is supported by substantial evidence. *See Ivey v. Barnhart*, 393 F. Supp. 2d 387, 390 (E.D.N.C. 2005) (remand is appropriate where ALJ fails to discuss relevant evidence weighing against his decision) (citing *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987)).

## V.   This case should not be remanded under sentence six of 42 U.S.C. § 405(g) for consideration of additional evidence.

Claimant urges this court to remand this case under sentence six in order for the ALJ to consider evidence not previously presented to the ALJ or the Appeals Council. Pl.'s Mem. at 1, 17; [DE-41.2].

When a claimant submits evidence that has not been presented to the ALJ, the court may consider the evidence only for the limited purpose of deciding whether to issue a sentence-six remand under 42 U.S.C. § 405(g). Under sentence-six, "[t]he court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). In a sentence-six remand, the court does not rule on the correctness of the administrative decision, neither affirming, modifying, nor reversing the Commissioner's decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.*

In this case, Claimant seeks to introduce as new and material evidence the 25 October 2010

27

SSA Notice of Award, finding Claimant disabled as of March 2010. [DE-41.2]. Defendant argues an SSA decision favorably adjudicating a separate, subsequent claim is inconsequential to the present claim. Def.'s Mem. at 15. In particular, Defendant avers the gap of six months which exists between the date of the instant decision (8 September 2009) and the disability onset date (March 2010) noted in the subsequent disability determination "indicates [] the [SSA] did not believe that evidence suggested disability back at September 8, 2009." *Id.* Plaintiff contends the subsequent finding of disability "need not have existed during the period on or before the Commissioner's decision" in order to constitute new and material evidence." Pl.'s Mem. at 17 (citing *Hayes v. Astrue*, 488 F. Supp. 2d 560 (W.D. Va. 2007) and *Reichard v. Barnhart*, 285 F. Supp. 2d 728 (S.D. W. Va. 2003)).

While the Fourth Circuit has not ruled directly on whether a subsequent finding of disability with an onset date near the time of the denial of a claimant's initial application may constitute new and material evidence, courts addressing this issue have varied in their approach in determining whether the later award is material. Claimant relies on *Hayes*, wherein that court was presented with new evidence in the form of the Commissioner's decision to grant disability benefits to the claimant on a subsequent application one day after the ALJ's denial of her first application for benefits. 488 F. Supp. 2d at 564. The Commissioner in *Hayes* based the disability finding on the same impairments alleged in the claimant's first application for benefits; however, the claimant had not submitted to the court any medical records that served as the basis for the Commissioner's finding on the second application. *Id.* at 565. The *Hayes* court observed, however, that "[n]evertheless, where a second social security application finds a disability commencing at or near the time a decision on a previous application found no such disability, the subsequent finding of a disability may constitute new and material evidence." *Id.* (citing *Reichard*, 285 F. Supp. 2d at 734 (finding

28

the ALJ's decision granting disability benefits less than a week after he first pronounced claimant was not disabled is new and material evidence)). While observing that such evidence is not necessarily preclusive of disability as the application may involve different medical evidence, different time periods, and a different age classification, *id.* (citing *Bruton v. Massanari*, 268 F.3d 824, 827 (9th Cir. 2001)), the *Hayes* court remanded the case pursuant to sentence six in light of the possible inconsistency between the denial of disability benefits and the subsequent grant of benefits based on the same alleged physical limitations only one day after the ALJ's unfavorable decision. *Id.*; *see also Floyd v. Astrue*, No. 5:09-CV-323-D, 2010 U.S. Dist. LEXIS 56930, at *7-8, 2010 WL 2326508 at *3 (E.D.N.C. Apr. 26, 2010), adopted, 2010 U.S. Dist. LEXIS 56849, 2010 WL 2325606 (E.D.N.C. June 8, 2010) (finding SSA's "Notice of Attorney Advisor Decision" wherein claimant found disabled one day after the ALJ rendered an unfavorable decision new and material evidence);[12] *Breaux v. Astrue*, No. 09-03083, 2010 U.S. Dist. LEXIS 68041, 2010 WL 2733398 at *2 (E.D. La. June 16, 2010), adopted, 2010 U.S. Dist. LEXIS 67981, 2010 WL 2733330 (E.D. La. July 8, 2010) (holding "there is at least a reasonable possibility that evidence supporting disability with an onset date one day removed [from an unfavorable decision] may be persuasive in changing the outcome"

---

[12] The present case is materially different from *Floyd*, where that court was presented with an "Attorney Advisor Decision" which

> indicated Plaintiff only had the RFC to perform less than sedentary work. Moreover, the Attorney Advisory Decision relied at least partially on information that was available prior to the ALJ's October 30, 2008 decision. Likewise, the claim underlying the Attorney Advisory Decision involved substantially the same impairments as in the first claim, with no evidence of any sudden trauma or onset of medical conditions since the ALJ's decision.

*Floyd*, 2010 U.S. Dist. LEXIS 56930, 2010 WL 2326508 at *3 (internal citations omitted). Here, only the Notice of Award is before the court; there is no mention of impairments supporting the award decision nor any discussion of the evidence relied upon.

29

as to claimant's initial application for benefits); *Luna v. Astrue*, No. CIV 07-719-PHX-MHB, 2008 U.S. Dist. LEXIS 108381, 2008 WL 2559400 at \*2 (D. Ariz. June 23, 2008), aff'd, 623 F.3d 1032 (9th Cir. 2010) (noting importance of subsequent award depends upon the degree of shared evidence underlying the conclusions of both the prior unfavorable decision and the subsequent favorable decision but, even absent knowledge by the court of the similarity, finding of disability one day after the ALJ's decision deemed material).

Other courts, however, have held that the mere fact of a subsequent award of benefits recognizing disability beginning within close proximity to the date of an unfavorable decision does not *ipso facto* compel a sentence six remand. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 654 (6th Cir. 2009) (holding remand was not warranted on the basis of a subsequent grant of benefits, by itself, since the subsequent grant of benefits may be based upon a new age classification, a worsening of the claimant's condition, or some other change); *Dickson v. Astrue*, No. 5:07-CV-28 HLJ, 2008 U.S. Dist. LEXIS 27967, at \*1, 2008 WL 829206, at \*1 (E.D. Ark. Mar. 26, 2008) (holding "a different result on a subsequent application for disability is not material to the previous finding" despite determination of disability "as of . . . the day after the ALJ's decision"); *Howard v. Astrue*, No. 07-144-GWU, 2008 U.S. Dist. LEXIS 1689, at \*2, 2008 WL 108776, at \*1 (E.D. Ky. Jan. 9, 2008) (new award "is not evidence of the plaintiff's condition on or before the date of the ALJ's decision. While counsel . . . suggests . . . that his client did not suddenly become disabled the day after the ALJ's decision, the fallacy in this argument is that the subsequent award of benefits says nothing about the plaintiff's condition during the entire period being considered under the plaintiff's current application."). In *Allen*, the Sixth Circuit held that only the evidence supporting the subsequent favorable decision may constitute new evidence. *Allen*, 561 F.3d at 652. The court

30

further recognized that a sentence six remand would only be appropriate if the later favorable

decision was supported by new and material evidence that claimant "had good cause for not raising

in the prior proceeding." *Id.* at 653. In so holding, the Sixth Circuit reasoned as follows:

> If a subsequent favorable decision – separated from any new substantive evidence supporting the decision – could itself be "new evidence" under sentence six, the only way that it might change the outcome of the initial proceeding is by the power of its alternative analysis of the same evidence. But remand under sentence six is not meant to address the "correctness of the administrative determination" made on the evidence already before the initial ALJ. [*Melkonyan*, 501 U.S. at 98]. In addition, it is overly broad to read the words "new evidence" in sentence six to include a subsequent decision based on the same evidence. In *Melkonyan*, the Court noted that the legislative history of § 405(g) shows that "Congress made it unmistakably clear that it intended to limit the power of district courts to order remands for 'new evidence' in Social Security cases." *Id.* at 100.
>
> A sentence six remand would be appropriate based on Allen's subsequent favorable decision only if the subsequent decision was supported by new and material evidence that Allen had good cause for not raising in the prior proceeding. It is Allen's burden to make this showing under § 405(g), . . . , but he has failed to meet this burden. On appeal, Allen does not argue that there is any new substantive evidence that might change the outcome of the previous denial, but instead relies exclusively on the existence of the subsequent decision. To the extent that Allen argues that remand is appropriate based on the possibility of new and material evidence, this contradicts the clear language of § 405(g) that requires a "showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g)

*Allen*, 561 F.3d at 653 (footnote omitted; emphasis omitted); *see also Johnson v. Astrue*, No.

3:09-2458-JMC-JRM, 2010 U.S. Dist. LEXIS 142043, at *21-23, 2010 WL 6089082, at *8 (D.S.C.

Nov. 16, 2010) (finding rationale of *Allen* persuasive and holding a subsequent favorable decision

alone does not constitute new evidence meriting remand); *Sayre v. Astrue*, No. 3:09-01061, 2010

U.S. Dist. LEXIS 125678, *10, 2010 WL 4919492, at *4 (S.D. W. Va. Nov. 29, 2010) (adopting

rationale of *Allen*).

As the *Sayre* court explained, the Sixth Circuit's analysis "makes sense because using a

subsequent decision as independent evidence is tantamount to a collateral attack on the initial

decision. Permitting a claimant to obtain a remand in a similar case would run counter to the need for finality and consistency between SSA disability determinations." *Sayre*, 2010 U.S. Dist. LEXIS 125678, *10, 2010 WL 4919492, at *4. Here, Claimant relies exclusively on the subsequent decision granting benefits. *See* Notice of Award [DE-41.2]. While Claimant contends "the second decision was made based on largely the same evidence as was submitted for the first claim," the Notice of Award provides no evidentiary basis for its decision. Claimant has not articulated, nor is it apparent, whether the subsequent decision would undermine the decision at issue, since the later decision, with a disability finding six months after the ALJ's instant decision, may actually relate to a deterioration in his condition or some other intervening cause. *See Allen*, 561 F.3d at 654 (explaining a claimant must present the evidence supporting a subsequent disability finding so that a court can determine whether the "new determination might be based on a change in the claimant's condition that occurred after the initial determination or a change in the claimant's circumstances"); *Rhodes v. Barnhart*, No. 1:04-CV-22, 2005 U.S. Dist. LEXIS 42876, at *31 (W.D.N.C. Mar. 30, 2005) (new evidence must relate to the time period for which benefits were denied and may not merely be evidence of a later-acquired disability or of subsequent deterioration of the previously non-disabling condition) (citing *Raglin v. Massanari*, 39 Fed. Appx. 777, 779 (3d Cir. 2002)). Accordingly, Claimant's request for a sentence-six remand based on a subsequent finding of disability, standing alone and without any opportunity to consider the basis for that finding, should be denied as the finding alone does not constitute new evidence. *See Allen*, 561 F.3d at 653.

## CONCLUSION

For the reasons stated above, this court RECOMMENDS Claimant's Motion for Judgment on the Pleadings [DE-41] be GRANTED, Defendant's Motion for Judgment on the Pleadings be

DENIED [DE-46] and the case be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the Memorandum and Recommendation. It is RECOMMENDED further that Claimant's motion to remand this case for consideration of new evidence pursuant to sentence six of 42 U.S.C § 405(g) be DENIED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 20th day of July, 2011.

Robert B. Jones, Jr.
United States Magistrate Judge

33